**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DANTE BROWN, | ) | |
| | ) | Case No. 18-cv-05955 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Honorable Sharon Johnson Coleman |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., et al., | ) | Magistrate Judge Sheila M. Finnegan |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF DANTE BROWN'S RESPONSE TO THE WEXFORD DEFENDANTS'
LOCAL RULE 56.1(a) STATEMENT OF MATERIAL FACTS**

NOW COMES Plaintiff Dante Brown, and in response to the Wexford Defendants' Local

Rule 56.1(a) Statement of Material Facts, states as follows:

**INTRODUCTORY STATEMENT**

Defendants' purported statement of material facts is inappropriate, improper, and not in

compliance with L.R. 56.1(a). Several paragraphs contain legal arguments and even more do not

address material facts. "[A] movant's 56.1(a) statement should contain *only* factual allegations."

*Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) (emphasis in original). "It is inappropriate

to allege legal conclusions in a 56.1(a) statement on the off-chance that one's opponent might not

file a correct response." *Id*. "Additionally, the 56.1(a) statement should be limited to *material* facts,

that is, facts pertinent to the outcome of the issues identified in the summary judgment motion."

*Id*. (emphasis in original).

In light of the foregoing, Mr. Brown objects to each and every statement to the extent that

it is not compliant with the Local Rules. Mr. Brown respectfully requests that this Court use its

discretion to disregard all noncompliant statements of fact. *See Cook Composites and Polymers

Co. v. General Chauffeurs, Sales Drivers and Helpers Union, Local 179*, No. 11 C 7186, 2012

WL4499058, at *1, n. 1 (N.D. Ill. Sept. 28, 2012) (where certain statements set forth improper

argument rather than facts, the court refused to consider them).

## A.     JURISDICTION AND VENUE

1.      Plaintiff's Second Amended Complaint alleging claims pursuant to 42 U.S.C. §
1983 and state law negligence against Defendants was received on April 18, 2019. (Dkt. 39).  This
remains the operative Complaint.  *Id.*

> **RESPONSE:** Subject to the Introductory Statement above, Undisputed.

2.      This Court has jurisdiction pursuant to 28 U.S.C. §1331. (Dkt. 50).

> **RESPONSE:** Subject to the Introductory Statement above, Undisputed.

3.      Venue is also proper in the Northern District of Illinois pursuant to 28 U.S.C.
§1391(b)(2) because the events giving rise to Plaintiff's claims occurred within this district at
Stateville Correctional Center ("Stateville") located in Crest Hill, Illinois.  (Dkt. 50).

> **RESPONSE:** Subject to the Introductory Statement above, Undisputed.

## B.     PARTIES

4.      Plaintiff, Dante Brown, is an individual in custody within the Illinois Department
of Corrections ("IDOC") for all times relevant to this suit.  *See* Wexford Defendants' Exhibit 1,
Plaintiff's Deposition, p. 12:16-21, 24; 13:1.  Plaintiff has no medical or dental training.  *Id.* at p.
12:8-11.

> **RESPONSE:** Subject to the Introductory Statement above, Undisputed.

5.      Plaintiff's allegations against Defendants concern the treatment and extraction of
Tooth #29 (bottom right molar).  (Wex. Defs. Ex. 1, p. 34:8-11).

> **RESPONSE:** Subject to the Introductory Statement above, Undisputed.  Mr.
>
> Brown further states that his allegations against Defendants include allegations beyond the
>
> treatment and extraction of Tooth #29 (bottom right molar). Mr. Brown's allegations
>
> against Defendants also concern Mr. Brown's post-extraction treatment. (Dkt. 39, ¶¶ 22-
>
> 25.)

6.      Defendant, Wexford Health Sources, Inc., is a private corporation that has contracted with the State of Illinois to provide certain medical treatment to individuals within the custody of the IDOC. (Dkt. 50). Wexford retains, either through employment or contract, dentists, and oral surgeons to practice dentistry at Stateville. *See* Wexford Defendants' Exhibit 2, Dr. Sandhu's Deposition, p. 11:20-24).

RESPONSE: Subject to the Introductory Statement above, Undisputed.

7.      Defendant, Dr. Saleh Obaisi, was a medical physician employed by Wexford. (Dkt. 50, ¶4). Dr. Obaisi was the Medical Director at Stateville during the relevant time period applicable to Plaintiff's Complaint. (*Id.*). As the Medical Director, Dr. Obaisi had no responsibility to prepare a collegial review or referral for a tooth extraction performed for an onsite oral surgeon. (Wex. Defs. Ex. 2, p. 23:20). Dr. Obaisi was not involved in dentistry or the monitoring of dental care at Stateville. (Wex. Defs. Ex. 2, p. 78:20-25; 79:1-7; 80:13-16; Wex. Defs. Ex. 5, 68:3-5).

RESPONSE: Disputed in part. Mr. Brown disputes that this statement is a proper

characterization of Dr. Obaisi's responsibilities with regard to the collegial review process

and referrals for a tooth extraction performed for an onsite oral surgeon. First, it is unclear

from the record the identities of the individuals who participated in collegial review

conferences and whether Dr. Obaisi was present for those conferences. (Dkt. 210-4, at

114:9–21.) Second, Dr. Obaisi also reviewed and signed off on referral request forms

related to dental care that went through the collegial review process (Wex RFP

PROD000658-694; Dkt. 210-2 at 15:13-19, 17:3-6, 17:18-18:2, IDOC 000163, 65, and

67.) Third, Dr. Obaisi treated Mr. Brown on three separate dates after the extraction of his

tooth and prescribed him Ibuprofen. (Dkt. 210-9, at p. 8, Exhibit C; Wexford Defendant's

Answers to Plaintiff's Amended Third Set of Interrogatories.) Fourth, if there was a

medical condition about which dentists at Stateville needed to confer with Dr. Obaisi prior

to performing services, they would hold such conferences. (Dkt. 210-5 at 67:10–24.)

Subject to the Introductory Statement above, the rest of paragraph 7 is Undisputed.

8.      Defendant, Dr. Frederick Craig, was an oral surgeon retained by Wexford to perform oral surgeries at numerous correctional facilities within Illinois. (Wex. Defs. Ex. 2, p. 34:18-24; 35:3-5; *see* also Wexford Defendants' Exhibit 4, Deposition Transcript of Dr. Richard

Orenstein, p. 17:6-10; *See* Wexford Defendants' Exhibit 5, Deposition Transcript of Dr. Jacqueline Mitchell, p. 34:6-12, 40:24-25, 41:1).

RESPONSE: Subject to the Introductory Statement above, Undisputed.

9.      Defendant, Dr. Richard Orenstein, is a dentist employed by Wexford.  (Wex. Defs. Ex. 2, p. 70:8-10; Wex. Defs. Ex. 4, p. 6:14-18).  Dr. Orenstein worked as an onsite dentist at Stateville during the relevant time period applicable to Plaintiff's Complaint.  (*Id.* at p. 8:20-22).

RESPONSE: Subject to the Introductory Statement above, Undisputed.

10.     Defendant, Dr. Jacqueline Mitchell, is a dentist then employed by the IDOC from 1992-2017.  (Wex. Defs. Ex. 5, p. 7:3-7).  Dr. Mitchell worked as an onsite dentist at Stateville during the relevant time period applicable to Plaintiff's Complaint.  (*Id.* at p. 8:6-11; 12:14-20).

RESPONSE: Subject to the Introductory Statement above, Undisputed.

C.      UNDISPUTED MATERIAL FACTS

### *Facts Related to Plaintiff's Medical History*

11.     Plaintiff was diagnosed with Type 2 Diabetes in 2019.  (Wex. Defs. Ex. 1, p. 25:4-11; Wex. Defs. Ex. 4, p. 112:7-8).  As part of his treatment and overall management of his Diabetes, Plaintiff was advised by medical professionals to be cognizant of what he ate.  (*Id.* at p. 26:10-24). This included not consuming an abundance of sugary foods. *Id.*

RESPONSE: Disputed in part. The second and third sentences in Paragraph 11

should be disregarded as immaterial. Pursuant to Local Rule 56.1(a)(3) Defendants were

required to submit a statement of material facts. Subject to the Introductory Statement

above, the rest of paragraph 11 is Undisputed.

12.     Plaintiff also receives insulin on a daily basis in the form of injections and pills. (Wex. Defs. Ex. 1, p. 27:5-9).  He also uses Accu-Check to monitor his blood sugar levels.  (*Id.* at p. 27:10-14). Plaintiff admitted to being aware that he needed to consume less sugar in order to keep his blood sugar levels in check.  (*Id.* at p. 27:20-22).  Plaintiff has an admitted preference for "junk food," which he purchases at commissary.  (Wex. Defs. Ex. 1, p. 30:1-10).

RESPONSE: Disputed. Mr. Brown does not dispute that he receives insulin on a

daily basis and uses Accu-Check to monitor his blood sugar levels, but the entirety of

Paragraph 12 should be disregarded as immaterial. Pursuant to Local Rule 56.1(a)(3)

Defendants were required to submit a statement of material facts.

### *Facts Related to Plaintiff's Dental Treatment*

13.     On May 2, 2017, Plaintiff made a sick call/medical service request to be seen by the dental department at Stateville for a teeth cleaning. *See* Wexford Defendants' Exhibit 3, Selection of Plaintiff's 2017 Medical and Dental Records, p. Brown 000230).

**RESPONSE:** Disputed. First, the document cited by Defendants does not support

the assertion. Second, on May 2, 2017, someone filled out a medical services request on

Mr. Brown's behalf and put "clean" on the form. (Dkt. 210-1, 132:21–7, Brown 000185.)

14.     On May 5, 2017, Plaintiff was seen by Dr. Orenstein for reported pain in the lower right quadrant of his mouth. (Wex. Defs. Ex. 3, p. Wexford 000184[1], Brown 000230; Wex. Defs. Ex. 4, p. 31:7-12). Dr. Orenstein performed an exam and took a radiograph of Plaintiff's mouth. *Id.* It was determined that Plaintiff had an impacted tooth at tooth #29. *Id.* Dr. Orenstein recommended the tooth be removed. *Id.* Dr. Orenstein also prescribed 400 mg of Ibuprofen (30 tabs) for pain to be taken every 4 to 6 hours. (Wex. Defs. Ex. 3, p. Wexford 000262; Wex. Defs. Ex. 4, p. 31:7-12; 39:19-22; 65:19-23). Dr. Orenstein then issued a referral for an onsite surgeon to Wexford for approval. (Wex. Defs. Ex. 3, p. Wexford 000184, Brown 000230).

**RESPONSE:** Disputed in part. Dr. Orenstein did simply not recommend that the

tooth be removed; he recommended specifically that the tooth be extracted. (Brown

000230; Dkt. 210-4, at 31:7–12). Extraction is a form of oral surgery. (Dkt. 210-7, at 31:7–

13, 101:22–102:6.) Subject to the Introductory Statement above, the rest of paragraph 14

is Undisputed.

15.     On May 8, 2017, Plaintiff was seen by Dr. Craig to evaluate his tooth #29. (Wex. Defs. Ex. 3, p. Wexford 000184, Brown 000230; Wex. Defs. Ex. 4, p. 33:18-20). Dr. Craig concurred that it was clinically indicated that tooth #29 could be extracted. *Id.* Notably, Dr. Craig also documented that Plaintiff was asymptomatic at the time of his visit, indicating it was not emergent. (Wex. Defs. Ex. 3, p. Wexford 000184, Brown 000230; Wex. Defs. Ex. 5, 41:4-5). Wexford approved the request for onsite extraction of tooth #29. (Wex. Defs. Ex. 2, p. 55:18-20).

---

[1] Wex. Defs. Ex. 3, p. Wexford 000184 does not support any of the facts for which it is cited throughout the entirety of the Wexford Defendants' statement of facts.

**RESPONSE:** Disputed in part. Mr. Brown disputes the second sentence of Paragraph 15. Mr. Brown disputes the Wexford Defendants' characterization that Dr. Craig concurred that it was "clinically indicated" that tooth #29 could be extracted. The document cited by the Wexford Defendants does not use the word "clinically." The Wexford Defendants' characterizations are irrelevant and should be disregarded. Mr. Brown also disputes sentence three. Mr. Brown disputes that he was asymptomatic at the time of the visit. Mr. Brown told Dr. Craig explicitly that he was in pain. (Dkt. 210-1, at p. 41:22–42:5.) Mr. Brown also disputes the Wexford Defendants' statement "indicating it was not emergent." This is a characterization, not a fact. That statement is not found in any of the documents cited by the Wexford Defendants. The Wexford Defendants' characterizations are irrelevant and should be disregarded. Subject to the Introductory Statement above, the rest of paragraph 15 is Undisputed.

16.     On June 23, 2017, Wexford approved of Dr. Orenstein's second request for Plaintiff to have tooth #29 removed off-site. (Wex. Defs. Ex. 2, p. 53:2-5; Wex. Defs. Ex. 3, p. Wexford 000171).

**RESPONSE:** Disputed. Wexford approved of Dr. Orenstein's *first* request for Mr. Brown to have tooth #29 removed off-site. (Dkt. 210-9, at p. 11.)

17.     On June 28, 2017, Plaintiff was seen by Dr. Mitchell for complaints of pain in his lower right jaw. (Wex. Defs. Ex. 3, p. Wexford 000184, Brown 000230). Following an exam, Dr. Mitchell prescribed Plaintiff 800 mg of Motrin (30 tabs) to be taken three times daily. *Id.*

**RESPONSE:** Disputed in part. On June 28, 2017, Mr. Brown was seen by Dr. Mitchell for complaints of pain in the region of tooth #29. (Dkt. 210-9, at p. 7, Brown 000230.) Subject to the Introductory Statement above, the rest of paragraph 17 is Undisputed.

6

18.     On July 11, 2017, Dr. Orenstein saw Plaintiff for a routine exam, bitewing radiographs, and an oral cancer screening. (Wex. Defs. Ex. 3, p. Wexford 000184, Brown 000230). In his notes, Dr. Orenstein documented that dental caries were present on teeth #14 and #15 and that filings were scheduled along with the extraction of Plaintiff's tooth #29.  *Id.*

**RESPONSE:** Subject to the Introductory Statement above, Undisputed

19.     On July 18, 2017, Plaintiff was taken to Joliet Oral Surgeons and had tooth #29 surgically extracted by Dr. Schieve at the direction and approval of Wexford and Dr. Orenstein. (Wex. Defs. Ex. 3, p. Wexford 000174, Joliet Oral Surgeons 000002).  Dr. Schieve testified that he utilized local anesthetic during Plaintiff's extraction and then sectioned Plaintiff's tooth and or a portion of the bone to access Plaintiff's tooth #29 without damaging other teeth. (Wex. Def. Ex. 6, p. 20:6-9).  After Dr. Schieve removed the molar, he used section gel foam to place in the socket. (*Id.* at p. 20:10-11).  Dr. Schieve also prescribed Plaintiff with approximately 5 days' worth of Tylenol #3. (*Id.* at p. 20:13-14, 21-23).  Dr. Schieve testified that Plaintiff did appear to be in pain prior to the procedure.  (*Id.* at p. 21:9-16).

**RESPONSE:** Disputed in part.  No document cited by the Wexford Defendants

supports the contention that Wexford and Dr. Orenstein directed or approved the extraction

of Mr. Brown's tooth.  Dr. Schieve's notes on the day of Mr. Brown's extraction contradict

his testimony. The notes indicated that Mr. Brown was in pain. (Ex. D, Joliet Oral Surgeons

000002.) Subject to the Introductory Statement above, the rest of Paragraph 19 is

Undisputed.

20.     The next day, Plaintiff was seen by Dr. Orenstein as a follow-up appointment following his extraction. (Wex. Defs. Ex. 3, p. Wexford 000262, Brown 000229; Wex. Defs. Ex. 4, p. 70:1-3; 90:2-4).  Dr. Orenstein noted that the area was healing and that all other procedures (i.e., fillings) are to be rescheduled since surgery was done the day prior.  *Id.*  Dr. Orenstein also prescribed Plaintiff with Tylenol #3, Motrin, and Amoxicillin. (Wex. Defs. Ex. 3, p. Wexford 000262).

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

21.     On July 24, 2017, Dr. Orenstein saw Plaintiff after complaining of pain at his extraction site and vomiting. (Wex. Defs. Ex. 3, p. Wexford 000183, Brown 000229).  After an examination, Dr. Orenstein determined Plaintiff had a dry docket at the extraction site of tooth #29.  *Id.*  Dr. Orenstein treated the dry socket by placing medicated dressing inside the socket and scheduled Plaintiff for a follow-up appointment.  *Id.*  It was noted in his dental chart that he had pain medication.  *Id.*

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

22.     The next day, Plaintiff saw Dr. Orenstein for an emergency visit for complaints of pain. (Wex. Defs. Ex. 3, p. Wexford 000183, Brown 000229; Wex. Defs. Ex. 4, p. 73:12-22). Dr. Orenstein irrigated the dry socket area and repacked the area with medicated dressing. *Id.* Dr. Orenstein also scheduled Plaintiff for a follow-up appointment. *Id.*

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

23.     On July 26, 2017, Plaintiff saw Dr. Orenstein complaining of a sore throat and difficulty swallowing. (Wex. Defs. Ex. 3, p. Wexford 000183, Brown 000229; Wex, Defs. Ex. 4, p. 75:14-16). Upon examination, Dr. Orenstein noted inflammation in the tonsil area and referred Plaintiff to a Physician's Assistant. *Id.* Plaintiff was also, again, scheduled for a follow up appointment regarding his dry socket with the dental department. *Id.*

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

24.     On July 28, 2017, Dr. Orenstein saw Plaintiff for a follow-up appointment. (Wex. Defs. Ex. 3, p. Wexford 000183, Brown 000229; Wex. Defs. Ex. 4, p. 75:20-24). Plaintiff reported to Dr. Orenstein that he was not in pain, that he had seen the Physician's Assistant about his throat who prescribed Amoxicillin and throat lozenges. (*Id.* at p. Wexford 000265).

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

25.     On July 31, 2017, Dr. Orenstein saw Plaintiff regarding his dry socket. (Wex. Defs. Ex. 3, p. Wexford 000182, Brown 000228; Wex. Defs. Ex. 4, p. 76:1-6, 16-17). Dr. Orenstein irrigated, cleaned, stimulated bleeding at the extraction site of tooth #29, and re-packed the area with medicated dressings. *Id.* Dr. Orenstein noted that exposed bone was still present and scheduled Plaintiff for a follow-up appointment. *Id.*

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

26.     On August 4, 2017, Plaintiff was seen by Dr. Orenstein. (Wex. Defs. Ex. 3, p. Wexford 000182, Brown 000229; Wex. Defs. Ex. 4, p. 77:3-11). Plaintiff reported experiencing soreness, but no pain in the area of tooth #29. *Id.* Upon examination, Dr. Orenstein noted that exposed bone was still present. *Id.* Dr. Orenstein then cleaned and re-packed Plaintiff's dry socket. *Id.* Plaintiff was scheduled for a follow-up appointment. *Id.*

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

27.     A few days later on August 7, 2017, Plaintiff was seen by Dr. Orenstein. (Wex. Defs. Ex. 3, p. Wexford 000182, Brown 000228; Wex. Defs. Ex. 4, p. 77:21). During this visit, Plaintiff reported that the dry socket dressing had come out. *Id.* Dr. Orenstein cleaned the area and repacked it, noting that healing was satisfactory. *Id.*

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

28.     On August 9, 2017, Plaintiff put in a sick call/medical services request for complaints of pain in the lower right side of his mouth. (Wex. Defs. Ex. 3, p. Brown 000189, 000228). Plaintiff was scheduled to be seen the next day. *Id.*

RESPONSE: Subject to the Introductory Statement above, Undisputed.

29.     On August 10, 2017, Plaintiff was seen by Dr. Orenstein. (Wex. Defs. Ex. 3, p. Wexford 000182, Brown 000228; Wex. Defs. Ex. 4, p. 78:6-7). Dr. Orenstein cleaned the extraction site area and noted that the socket site was granulating in. *Id.* Dr. Orenstein also ordered Plaintiff a soft diet for two weeks. (Wex. Defs. Ex. 3, p. Brown 000190).

RESPONSE: Subject to the Introductory Statement above, Undisputed.

30.     On August 21, 2017, Plaintiff put in a sick call/medical services request complaining of pain at his extraction site. (Wex. Defs. Ex. 3, p. Brown 000191, 000227). Plaintiff was scheduled to see dental on August 22, 2017. *Id.*

RESPONSE: Subject to the Introductory Statement above, Undisputed.

31.     On August 22, 2017, Plaintiff was seen by Dr. Orenstein. (Wex. Defs. Ex. 3, p. Wexford 000181, Brown 000227; Wex. Defs. Ex. 4, p. 80:9-10). Upon examination, Dr. Orenstein noted that the extraction site was granulating in, albeit slowly, possibly due to Plaintiff's Diabetes. (*Id.*; Wex. Defs. Ex. 4, p. 80:11-19). Dr. Orenstein informed Plaintiff that due to his Diabetes, the healing process could be longer than normal. (Wex. Defs. Ex. 3, p. Wexford 000181, Brown 000227). Dr. Orenstein then irrigated the extraction site and prescribed Plaintiff with 500 mg of Penicillin VK and Ibuprofen. (*Id.* at p. Wexford 000266). Dr. Orenstein prescribed Plaintiff Penicillin as a preventative measure. (Wex. Defs. Ex. 4, p. 80:20-23; Wex. Defs. Ex. 7, p. 132:8-12, 22-24).

RESPONSE: Disputed in part. Subject to the Introductory Statement above, the

first four sentences are Undisputed. Mr. Brown disputes the fifth sentence. Disputed as to

the reason Mr. Brown was prescribed Penicillin. Penicillin might have been prescribed if

Dr. Orenstein determined there was an infection. (Dkt. 210-7, at 146:5–14; Dkt. 213-12, at

145:7–146:14.) The Wexford Defendants' citation to Wex. Defs. Ex. 7, p. 132:8–12, 22–

24, does not support the assertion stated.

32.     On September 1, 2017, Plaintiff was seen by another onsite dentist, Dr. Garg, for a follow-up appointment regarding his extraction site. (Wex. Defs. Ex. 3, p. Wexford 000181, Brown 000227). Dr. Garg noted that the extraction site was slowly healing and was covered with granulated tissue and that a bone chip was removed from the area. *Id.* Dr. Garg noted that Plaintiff

9

reported to be taking his previously antibiotics and scheduled Plaintiff for a follow-up appointment. *Id.*

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

33.     On September 8, 2017, Plaintiff was seen by Dr. Orenstein for a follow-up appointment for extraction site. (Wex. Defs. Ex. 3, p. IDOC 000173; Wex. Defs. Ex. 4, p. 82:4-9). Following examination, Dr. Orenstein noted that Plaintiff's healing was slow but satisfactory. *Id.* Dr. Orenstein also recommended delaying filings for the teeth on the upper left portion of Plaintiff's mouth. *Id.* Plaintiff was scheduled for a follow-up appointment. *Id.*

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

34.     On September 27, 2017, Plaintiff put in a sick call/medical services request complaining of pain. (Wex. Defs. Ex. 3, p. Brown 000192). Plaintiff was scheduled for an appointment with dental. *Id.* However, due to Plaintiff's tardy arrival, his appointment was rescheduled and then he left before he was seen. *Id.*

**RESPONSE:** Disputed. Mr. Brown put in a sick call/medical services request

complaining of tooth pain. (Wex. Defs. Ex. 3, p. Brown 000192). The third sentence of

Paragraph 34 is not supported by Brown 000192. The Wexford Defendants'

characterizations are irrelevant and should be disregarded.

35.     On October 9, 2017, Plaintiff put in another sick call/medical services request for complaints of severe pain. (Wex. Defs. Ex. 3, p. Brown 000193). Dr. Orenstein saw Plaintiff on October 10, 2017, for an emergency exam. *Id.* Dr. Orenstein removed a piece of bone from the extraction site. (*Id.*, Wex. Defs. Ex. 4, p. 82:10-17). Dr. Orenstein noted that Plaintiff had tolerated the procedure well and prescribed him with 400mg of Ibuprofen for pain. (Wex. Defs. Ex. 3, p. Wexford 000181).

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

36.     On November 3, 2017, Plaintiff was seen by Dr. Orenstein for a follow-up appointment. (Wex. Defs. Ex. 3, p. Wexford 000180, Brown 000226; Wex. Defs. 4, p. 83:16-22). Upon examination, Dr. Orenstein an area of exposed bone at the extraction site and scheduled a follow-up appointment two weeks out to assess tissue healing. *Id.* Dr. Orenstein also put in a referral for Plaintiff to be seen by Joliet Oral Surgeons. (Wex. Defs. Ex. 3, p. Joliet Oral Surgeons 000008).

**RESPONSE:** To the extent that Defendant's intended to say, "Dr. Orenstein *noted* an area of exposed bone at the extraction site," and subject to the Introductory Statement above, Undisputed.

37. On November 7, 2017, Plaintiff was seen by Dr. Orenstein. (Wex. Defs. Ex. 3, p. IDOC 000172). Upon examination, Dr. Orenstein again noted that a piece of bone was exposed and put in another referral for Plaintiff to be seen by Joliet Oral Surgeons. (*Id.* at p. Wexford 000174).

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

38. On December 14, 2017, Plaintiff traveled to Joliet Oral Surgeons and was seen by Dr. Schieve. (Wex. Defs. Ex. 3, p. Joliet Oral Surgeons 000001-2). Dr. Scheive removed a piece of bone approximately 1mm x 1mm from the extraction site. *Id.* He further prescribed Plaintiff with Tylenol #3, 400mg of Motrin, and 150mg of Clindamycin. (*Id.* at p. Wexford 000269).

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

39. On December 19, 2017, Plaintiff was seen for a follow-up appointment by Dr. Seppel. (Wex. Defs. Ex. 3, p. Wexford 000180, Brown 000226). Following his examination, Dr. Seppel prescribed Plaintiff 500mg of Penicillin VK. (*Id.* at p. IDOC 000260).

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

40. Dr. Craig passed away on or about June 7, 2018. (Dkt. 29).

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

### *Facts Related to Malpositioned Teeth, Dry Socket, and Extraction*

41. Permanent teeth form in individuals as early as eleven or twelve years of age. (Wex. Defs. Ex. 4, p. 130:17-19; 131:5-8). Malpositioned, impacted teeth develop can develop during that time. (*Id.* at p. 130:4-16). Essentially, a malpositioned tooth formed in the wrong position. (*Id.*; *see also* Wexford Defendants Exhibit 6, Deposition Transcript of Dr. Glen Schieve, p. 10:12-14; *see also* Wexford Defendants Exhibit 7, Deposition Transcript of Dr. Earl Stubblefield, Jr., DMD, p. 99:2-23). A malpositioned tooth can also be impacted; an impacted tooth is when the crown (or top) of the tooth is either partially or completely surrounded by bone. (Wex. Defs. Ex. 7, p. 98:1-6). Just because a tooth is impacted and/or malpositioned does not mean that the tooth is going to cause a person pain or is emergent. (Wex. Defs. Ex. 7, p. 195:9-13).

11

**RESPONSE:** Disputed in part. Mr. Brown disputes sentences one and two as immaterial, and they should be disregarded. Pursuant to Local Rule 56.1(a)(3) Defendants were required to submit a statement of material facts. Mr. Brown disputes sentence three as a characterization, not a fact. The Wexford Defendants' characterizations are irrelevant and should be disregarded. Subject to the Introductory Statement above, sentences four and five are Undisputed.

42.     Tooth #29 is a permanent tooth; specifically, a second premolar on the lower right hand side of a patient's mouth. (Wex. Defs. Ex. 7, p. 97:7-9).  As it pertains to Plaintiff, his tooth #29 was malpositioned for approximately 20 years prior to extraction.  (*Id.* at 131:17-18; 132:3-5; Wex. Defs. Ex. 6, p. 13:10-14; 22:23-24; 69:10-17; Wex. Defs. Ex. 7, p. 109:19-23).

**RESPONSE:**  Subject to the Introductory Statement above, Undisputed.

43.     Malpositioned teeth do not always require extraction, as was in Plaintiff's case. (Wex. Defs. Ex. 4, p. 132:6-15; 133:22-24; Wex. Defs. Ex. 5, p. 37:11-15; Wex. Defs. Ex. 6, p. 13:18-22; 64:4-13; Wex. Defs. 7, p. 104:14-24).  In fact, there may be a greater risk in extracting the tooth, if similar to Plaintiff's situation, the surgery would be invasive.  (Wex. Defs. Ex. 7, p. 101:12-18; 107:11-16).  As an alternative to surgery, pain from malpositioned teeth can be treated with anti-inflammatories and ibuprofen.  (Wex. Defs. Ex. 4, p. 133:12-18; Wex. Defs. Ex. 6, p. 25:9-13).  It can also be treated by practicing good oral hygiene.  (Wex. Defs. Ex. 6, p. 23:2-8).

**RESPONSE:** Disputed in part. The documents and testimony to which the Wexford Defendants cite state that extraction is not always required in all instances.  In contrast, Mr. Brown's tooth required extraction, as determined by Dr. Orenstein and Dr. Craig. (Dkt. 210-3, at Brown 000230.) In addition, Dr. Schieve reviewed Mr. Brown's medical history, dental history, looked at his x-rays, looked at his mouth, and agreed that Tooth #29 was causing problems and that the best solution was to remove the tooth. (Dkt. 210-6, at 14:18–15:2.) Mr. Brown disputes the second sentence of Paragraph 43, because it is a characterization of testimony, not a fact. The Wexford Defendants' characterizations are irrelevant and should be disregarded. The testimony cited actually states that there can be more risk when the surgery is invasive, not that there would be a greater risk in removing

the tooth than leaving it in. (Wex. Defs. Ex. 7, p. 101:12–18; 107:11–16). Mr. Brown

disputes the third sentence of Paragraph 43. Only sometimes can anti-inflammatories and

ibuprofen take care of the pain from a malpositioned tooth. (Wex. Defs. Ex. 4, p. 133:12–

18.) Mr. Brown disputes the fourth sentence as immaterial, and it should be disregarded.

Pursuant to Local Rule 56.1(a)(3) Defendants were required to submit a statement of

material facts.

44.     Malpositioned teeth have the potential to cause pain if food debris cumulates in or around the tooth or in and around the gums. (Wex. Defs. Ex. 6, p. 15:9-14). If the patient is unwilling or unable to remove the debris, the debris becomes an irritant to the nerves and gives the patient pain or cause an abscess where the tooth becomes non-vital. (Wex. Defs. Ex. 6, p. 15:15-19). As it pertains to Plaintiff, when Plaintiff was seen by Dr. Scheive at Joliet Oral Surgeons, he did not have an abscessed tooth. (Wex. Defs. Ex. 6, p. 16:2-4). Dr. Scheive also testified that the cause of Plaintiff's pain at tooth #29 was likely due to trapped food debris between tooth #29 and Plaintiff's gums. (*Id.* at p. 25:6-8). Dr. Scheive followed that testimony by opining that Plaintiff was not in "excruciating pain" when he saw Plaintiff. (*Id.* at 29:20-23).

RESPONSE: Disputed. Mr. Brown disputes the first sentence because there are

numerous reasons, outside of food debris accumulating, that can cause a mispositioned

tooth to cause pain. (Dkt. 210-7, at 100:2–16.) Mr. Brown disputes the second sentence as

immaterial and should be disregarded. Pursuant to Local Rule 56.1(a)(3) Defendants were

required to submit a statement of material facts. Mr. Brown also disputes sentence four.

The cause of Mr. Brown's pain from the impacted and malpositioned tooth is not stated in

his medical records. (Dkt. 210-3, at Brown 000230.) Subject to the Introductory Statement

above, sentences three and five are Undisputed.

45.     An extraction of a malpositioned tooth is not an emergency unless there are aggravating factors. (Wex. Defs. Ex. 6, p. 23:12-14, 18-24; 24:1). Dr. Schieve testified that because Plaintiff had no aggravating factors, there was not an urgent or emergent need to extract the tooth. (Wex. Defs. Ex. 6, p. 24:2-13; 40:14-21).

RESPONSE: Disputed. First, Dr. Schieve did not testify that extractions are not

an emergency unless there are aggravating factors. (Dkt. 210-6, 23:12–14, 18–24; 24:1).

Second, Dr. Schieve testified that Mr. Brown did not have an abscess. He did not testify

that Mr. Brown had no aggravating factors, nor did he testify that there was not an urgent

or emergent need to extract Mr. Brown's tooth. (Dkt. 210-6, at 24:2–13; 40:14–21).

Defendants' statements are a characterization of Mr. Schieve's testimony, not facts.

Defendants' characterizations are irrelevant and should be disregarded.

46.     It is common for patients to experience pain following a tooth extraction.  (Wex. Def. Ex. 6, p. 27:8-10; Wex. Defs. Ex. 7, p. 144:21-23).  This pain is routinely treated with pain medication. (*Id.* at p. 27:11-12, 17-21; 28:1-2).

RESPONSE: Disputed in part. Subject to the Introductory Statement above, the

first sentence of Paragraph 46 is Undisputed. The source cited for the second sentence does

not support the assertion. Pain medication is just one of the ways in which post-extraction

pain can be treated; it depends on what issues the patient is experiencing. (Dkt. 210-7, at

110:19-111:17, 144:5-145:22.)

47.     When a tooth is extracted, there is a hole in the jaw.  (Wex. Defs. Ex. 7, p. 110:2-3).  If a tooth is impacted, little pieces of bone may break off during the extraction procedure and are left behind. (Wex. Defs. Ex. 7, p. 151:3-10).  These bone fragments vary in size from extremely small to large.  (*Id.* at p. 151:13-19).  These bone chips usually work themselves out, but some remain lodged in the socket.  (*Id.*).

RESPONSE: Subject to the Introductory Statement above, Undisputed.

48.     The first step in the healing process is for that hole to fill with blood forming a blood clot that coverings exposed nerve endings until granulated tissue is formed.  (Wex. Defs. Ex. 4, p. 71:13-14; Wex. Defs. Ex. 6, p. 30:23-24; 31:1-3, 7-11; Wex. Defs. Ex. 7, p. 110:3-10). The granulated tissue turns into gum tissue. (Wex. Defs. Ex. 6, p. 31:14-19).  These blood clots can be removed, either intentionally or unintentionally making the socket "dry."  (*Id.* at 31:20-24; 32:1-3; Wex. Defs. Ex. 7, p. 110:12-15).  In other words, the walls of the socket of bone are exposed. (*Id.* at p. 110:15-18).  Uncontrolled Diabetes also negatively affects the healing process due to inconsistency in blood sugar levels.  (Wex. Defs. Ex. 4, p. 112:10-16; 123:12-17; Wex. Defs. Ex. 5, p. 71:12-22; Wex. Defs. Ex. 6, p. 32:7-13, 21-23).  Circulation is also poor in persons with uncontrolled Diabetes which affects the body's ability to get cells to the area needed for recovery. (Wex. Defs. Ex. 7, p. 149:2-10).  Additionally, eating hard foods like chips or drinking caffeinated beverages can impact healing of a tooth extraction site.  (Wex. Defs. Ex. 7, p. 253:7-

18).   In this case, Plaintiff has both documented uncontrolled Diabetes and consumes large amounts of junk food. (Wex. Defs. Ex. 1, p. 30:1-10; Wex. Defs. Ex. 7, p. 114:4-11).

> **RESPONSE:** Disputed in part. Mr. Brown disputes sentence seven of paragraph
>
> 48 as immaterial, and it should be disregarded. Mr. Brown also disputes the statement that
>
> he "consumes large amounts of junk food" as immaterial, and it should be disregarded.
>
> Pursuant to Local Rule 56.1(a)(3) Defendants were required to submit a statement of
>
> material facts. The Wexford Defendants are mischaracterizing facts to imply Mr. Brown
>
> ate junk food during his post-extraction recovery. This characterization is unsupported.
>
> Nowhere in Mr. Brown's medical records does it indicate that eating junk food contributed
>
> to his slow healing time. (Dkt. 210-7, at 257:19–258:1.) Defendants' characterizations are
>
> irrelevant and should be disregarded. Subject to the Introductory Statement above, the first
>
> six sentences are Undisputed.

49.     When treating a dry socket, a dentist irrigates with sterile saline the area of the tooth extraction to clear debris, i.e., food particles. (Wex. Defs. Ex. 4, p. 72:3-9; Wex. Defs. Ex, 7. P. 141:3-5).   After the area is cleaned, a dentist has a few avenues of treatment, including placing a gel foam and dry socket paste in the tooth socket to alleviate pain while it heals.  (*Id.*; Wex. Defs. Ex. 6, p. 34:14-24; 35:1-6; Wex. Defs. Ex. 7, p. 111:6-13).   It is reasonable for two different dentists to disagree about which kind of treatment to use, whether gel foam or dry socket paste. (Wex. Defs. Ex. 6, p. 35:7-10, 18-22).   Additionally, when treating a dry socket, it is normal for a treating dentist to see the patient more than once for continual treatment of the area. (Wex. Defs. Ex. 7, p. 134:10-24; 135:1-11).

> **RESPONSE:** Subject to the Introductory Statement above, Undisputed.

### *Facts Related to Wexford Policies and Procedures*

50.     Generally, when a dentist at initiates a referral to Wexford, the referral is assigned to utilization management and is then to assigned to a medical professional at Wexford who review the referral for approval or denial. (Wex. Defs. Ex. 2, p. 15:1-7; Wex. Defs. Ex. 4, p. 18:14-20). This review process is also known as a "collegial review." (*Id.* at p. 17:3-17).   Collegial reviews take place, at a minimum, on a weekly basis. (*Id.* at p. 18:10-12).

> **RESPONSE:** Subject to the Introductory Statement above, Undisputed.

51.     If a collegial review is approved for off-site care at a facility, the assigned site scheduler at that particular facility contacts the off-site providers and coordinates with the facility's security staff for the appointment. (Wex. Defs. Ex. 2, p. 21:9-14). Also, if a collegial review is approved for on-site care at a facility, the appropriate onsite clinic schedules the treatment for the providers in that particular clinic. (*Id.* at p. 21:20-23; 32:16-24; Wex. Defs. Ex. 4, p. 32:22-23). However, whenever an on-site surgeon comes, the site scheduler does not come into play. *Id.*

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

52.     Specifically, as it pertains to Dr. Craig, Dr. Craig would provide his schedule to medical staff at Stateville who would then schedule appointments based on the provided availability. (Wex. Defs. Ex. 2, p. 41:9-16; 48:25; 49:1-5; Wex. Defs. Ex. 4, p. 51:14-20). Wexford was not involved with scheduling appointments for Dr. Craig. (*Id.* at p. 47:23-25; 48:1-5). However, Dr. Craig was notified of the patients he was approved to see. (*Id.* at p. 41:24-25; 42:1-9).

**RESPONSE:** Disputed in part. Mr. Brown disputes the first sentence because Dr.

Craig's schedule was published by Wexford and available to medical staff at Wexford.

(Dkt. 210-9, at pp. 6, 10.) Subject to the Introductory Statement above, sentences two and

three are Undisputed.

53.     When Wexford became aware that Dr. Craig was no longer performing services, all his associated patients were scheduled with either an off-site oral surgeon or Dr. Gurthie, the oral surgeon hired to replace Dr. Craig. (Wex. Defs. Ex. 2, p. 65:5-9).

**RESPONSE:** Disputed. Mr. Brown was not scheduled with an off-site oral

surgeon when Wexford became aware that Dr. Craig was no longer performing services.

Dr. Orenstein had to submit a referral request for Mr. Brown's off-site extraction, which

then had to go through the collegial review process (Dkt. 210-9, at p. 10; Dkt. 210-2, at

17:3–6.) There is no documentation in the record that Mr. Brown was scheduled to go off-

site because Dr. Craig was no longer performing services at Stateville. (Dkt. 210-4, at 61:8–

22; Dkt. 210-2, at 63:4–14.)

54.     Wexford is not involved in treatment decisions for inmate patients, including Plaintiff. (Wex. Defs. Ex. 4, p. 14:21-24; 15:6-8).

**RESPONSE:** Disputed. Dentists employed by Wexford were necessarily acting as

Wexford's agents by making treatment decisions for inmate patients, including Mr. Brown.

(Dkt. 50, ¶4; Dkt 210-2, at 70:8–10; Dkt. 210-5, at 7:3–7).

### *Facts Related to Medical Opinions & Standard of Care*

55.     There are no guidelines that once a malpositioned tooth is discovered and
diagnosed, it must be extracted within a specific time frame. (Wex. Def. Ex. 6, p. 28:18-23; Wex.
Defs. Ex. 7, p. 246:).  This is echoed by the standard of care.  (*Id.* at p. 29:2-6; Wex. Defs. Ex. 7,
p. 168:14-17; 169:5-13).

**RESPONSE:** Disputed. First, the Wexford Defendants' citation to Wex. Defs. Ex.

7, even if complete, does not support the assertion for which it is cited. Second, these

statements contain legal conclusions and should be disregarded. *Malec v. Sanford*, 191

F.R.D. 581, 583 (N.D. Ill. 2000).

56.     Dr. Orenstein treats the patients at Stateville Correctional Center with the same
standard of care as he would patients in private practices.  (Wex. Defs. Ex. 4, p. 160:14-17).  In
the instant matter, Dr. Orenstein saw Plaintiff for treatment of his dry socket on a consistent basis,
beyond what is normally required, and in line with the standard of care.  (Wex. Defs. Ex. 7, p.
167:24; 168:1-8; 169:5-13; 174:5-8; 210:24; 211:1-17; 212:2-5; 213:2-10; 214:3-6).

**RESPONSE:** Disputed. First, These statements contain legal conclusions and

should be disregarded. *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). Second, it

highly disputed as to whether Dr. Orenstein acted in line with the applicable standard of

care. (Dkt. 210-9, at 12–15; Dkt. 210-7, at 251:22–24.)

57.     Dr. Obaisi's actions were within the standard of care as well.  (Wex. Defs. Ex. 7,
p. 217:20-24; 218:1-3).  He did not interfere, specifically delay, or hinder in any way the treatment
provided to Plaintiff.  (*Id.* at p. 218:4-8).

**RESPONSE:** Disputed. These statements contain legal conclusions and should be

disregarded. *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). Mr. Brown also

disputes that Dr. Obaisi acted within the applicable standard of care. Dr. Obaisi did, in fact,

interfere, delay, and hinder Mr. Brown's treatment. (Dkt. 213-6, at 8.)

58.     Wexford Health Care Sources, Inc., did not purposefully or deliberately cause delays in treatment of Plaintiff's tooth. (Wex. Defs. Ex. 7, p. 221:15-24; 222:1; 223:16-22). Plaintiff was provided with proper access to dental care. (Wex. Defs. Ex. 7, p. 173:12-23).  He had his pain addressed and ultimately had tooth #29 extracted. (Wex. Defs. Ex. 7, p. 175:11-20). Indeed, the timeline of Plaintiff's care was in line with the standard of care. (Wex. Defs. Ex. 7, p. 176:5-8, 12-22).

**RESPONSE:**  Disputed. All of the statements in Paragraph 58 contain legal

conclusions and should be disregarded. *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill.

2000).  Mr. Brown also disputes that he was provided with proper access to dental care,

that he had his pain addressed appropriately, and that his timeline was in line with the

applicable standard of care. (Dkt. 213-6, at 17-22.)

### Facts Related to Dr. Shulman's Involvement in Lippert

59.     Plaintiff's retained expert, Dr. Jay Shulman, DMD was a Court appointed Rule 706 consultant for the Lippert, et al., v. Baldwin, et al., Case No. 10-cv-4603 (N.D. Ill.).  *See* Wexford Defendants' Exhibit 8, Deposition of Dr. Jay Shulman, DMD, p. 42:15-19, 24-25; 43:1-5.  As a Rule 706 consultant, Dr. Shulman was a part of a team appointed to look at the IDOC health care system.  (*Id.*, see also p. 43:8-10).  As one of the appointed experts, Dr. Shulman contributed to and assisted in authoring the 2018 Lippert Report.  (*Id.* at p. 43:22-24).

**RESPONSE:**  Subject to the Introductory Statement above, Undisputed.

60.     The Lippert Court entered a "Second Order Appointing Expert" which dictated the terms and conditions of any appointment expert or consultant.  *See* Wexford Defendants' Exhibit 10. Section 1(c), states, "[t]he Expert, his consultants or assistants shall not provide opinions and/or testimony in unrelated cases based on knowledge and/or information gained in the course of performing their services in this matter."  *Id.* at p. 2.

**RESPONSE:**  Subject to the Introductory Statement above, Undisputed.

61.     Dr. Shulman reviewed and relied on both the 2014 and 2018 Lippert Reports in connection with forming his opinions for the instant matter. (Wex. Defs. Ex. 8, p. 84:11-24; 85:6-14; see also Wexford Defendants' Exhibit 9, Expert Report of Dr. Jay Shulman, DMD, pgs. 4-5, ¶¶A-B).  Logic follows that Dr. Shulman in turn relied on the work he performed as a consultant to the Court appointed expert in Lippert when formulating his opinions for the instant matter.  *Id.*

**RESPONSE:**  Disputed. Dr. Shulman did not rely on the work he performed as a

consultant to the court-appointed expert in *Lippert* when formulating his opinions in this

case. (Dkt. 210-8, at 83:11–85:8, 174:1–21.)

Dated:  November 21, 2022

                                   Respectfully Submitted,

                                   Dante Brown

By:   /s/ *Mark J. Silberman*
            One of his attorneys

            Benesch Friedlander Coplan and Aronoff
            71 S. Wacker Drive, Suite 1600
            Chicago, Illinois 60606
            Tel:  (312) 212-4949
            Email:  MSilberman@beneschlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2022, I electronically filed the foregoing document with the clerk of the court for the Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.


By:    /s/ *Mark J. Silberman*