**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DANTE BROWN, | ) | |
| | ) | Case No. 18-cv-05955 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Honorable Sharon Johnson Coleman |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., et al., | ) | Magistrate Judge Sheila M. Finnegan |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF DANTE BROWN'S RESPONSE TO**
**DEFENDANT JACQUELYN MITCHELL'S**
**LOCAL RULE 56.1(a) STATEMENT OF MATERIAL FACTS**

NOW COMES Plaintiff Dante Brown, and in response to Defendant Jacquelyn Mitchell's

Local Rule 56.1(a) Statement of Material Facts, states as follows:

**INTRODUCTORY STATEMENT**

Defendant's statement of material facts is inappropriate, improper, and not in compliance

with L.R. 56.1(a). Several paragraphs contain legal arguments, and even more do not address

material facts. "[A] movant's 56.1(a) statement should contain only factual allegations." *Malec v.*

*Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). "It is inappropriate to allege legal conclusions in a

56.1(a) statement on the off-chance that one's opponent might not file a correct response." *Id*.

"Additionally, the 56.1(a) statement should be limited to material facts, that is, facts pertinent to

the outcome of the issues identified in the summary judgment motion." *Id*. (emphasis in original).

In light of the foregoing, Mr. Brown objects to each and every statement to the extent that

it is not compliant with the Local Rules. Mr. Brown respectfully requests that this Court use its

discretion to disregard all noncompliant statements of fact. *See Cook Composites and Polymers*

*Co. v. General Chauffeurs, Sales Drivers and Helpers Union, Local 179*, 2012 WL 4499058, at

*1, n.1 (N.D. Ill. Sept. 28, 2012) (where certain statements set forth improper argument rather than

facts, the court refused to consider them).

## PARTIES

1.      Plaintiff Dante Brown ("Plaintiff") is an inmate under the custody and control of the Illinois Department of Corrections ("IDOC").  Ex. 1. He has been serving a life sentence for a double homicide since 2003. Ex. 2 at 9:18-21, 10:4-5.  On July 17, 2009, Plaintiff was transferred to Stateville Correctional Center ("Stateville"), where he remains housed today.  Ex. 14 at pp. 4-6.  Plaintiff has no medical or dental training. Ex. 2 at 12:8-11.

        **RESPONSE:**  Subject to the Introductory Statement above, Undisputed.


2.      Defendant, Dr. Jacquelyn Mitchell, has been a licensed dentist since 1979, and has been actively practicing as a general dentist since she was licensed. Ex. 3 at 7:14-16.  Dr. Mitchell was employed as a dentist with the Illinois Department of Corrections from 1992 until July 31, 2017; she worked exclusively at Stateville from 2002 until July 31, 2017.  *Id.* at 8:6-20.

        **RESPONSE:**  Subject to the Introductory Statement above, Undisputed.


3.      Dr. Richard Orenstein is a dentist and licensed to practice dentistry in Illinois and Virginia. Ex. 9 at 7:19-20.  Dr. Orenstein has been practicing as a general dentist since 1986.  *Id.* at 7:19-23.  He is also a named defendant in this lawsuit and a Wexford Health Sources, Inc. ("Wexford") employee. Ex. 1 at ¶ 5.

        **RESPONSE:**  Subject to the Introductory Statement above, Undisputed.


4.      Dr. Frederick A. Craig was an oral maxillofacial surgeon and employed with Wexford from March 1993 until he resigned on October 11, 2017. Ex. 17 at p. 15.  He is also a named defendant in this lawsuit. Dkt. 39 at ¶ 7.  Dr. Craig died on June 7, 2018.  Dkt. 29.

        **RESPONSE:**  Subject to the Introductory Statement above, Undisputed.


## NON-PARTY WITNESSES

5.      Dr. Jay Shulman, Plaintiff's expert witness, is a retired dentist and holds a retired license in the State of Texas.  Ex. 6 at p. 27; Ex. 11 at 12:7-10.  He does not maintain a clinical practice. Ex. 11 at 14:11-13; Ex. 6 at pp. 29-31. Dr. Shulman has been working as a self-employed consultant since approximately 2005.  Ex. 11 at 14:7-16.

        **RESPONSE:**  Subject to the Introductory Statement above, Undisputed.


6.      Dr. Earl Stubblefield, Jr., expert witness for the Wexford defendants, is a dentist and licensed in Mississippi. Ex. 7 at p. 19.  He owns and operates Stubblefield Dental Clinic, where he has practiced as a general dentist since 2003.  Ex. 7 at p. 17.  Additionally, Dr. Stubblefield has

been treating inmates for the past twenty years for the Lafayette County (MS) Detention Center. Ex. 7 at pp. 18-19.

> **RESPONSE:** Subject to the Introductory Statement above, Undisputed.

7.     Dr. Glen Schieve is an oral surgeon and the owner of Joliet Oral Surgeons. Ex. 13 at 8:21-24. He has been practicing oral surgery since approximately 1980 and has more than forty years of experience working with malpositioned teeth. Ex. 13 at 9:14-20.

> **RESPONSE:** Subject to the Introductory Statement above, Undisputed.

8.     Dr. Karanbir Sandhu is a licensed dentist employed by Wexford as a utilization management consultant for dentistry referrals. Ex. 10 at 79:12-14, 7:4-11.

> **RESPONSE:** Subject to the Introductory Statement above, Undisputed.

## JURISDICTION AND VENUE

9.     Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1367.

> **RESPONSE:** Subject to the Introductory Statement above, Undisputed.

10.     Venue is proper pursuant to 28 U.S.C. § 1391.

> **RESPONSE:** Subject to the Introductory Statement above, Undisputed.

## UNDISPUTED MATERIAL FACTS

11.     Any inmate requiring dental care at Stateville can schedule an appointment by putting in a "sick call request." Ex. 3 at 15:12-22; Ex. 9 at 28:3-13. The sick call requests are provided to the dental department, at which time any dentist could schedule the requests. *Id.*, Ex. 3 at 17:19-25, 18:1-3, 17-25, 19:1, 3-8. Whichever dentist is available when the sick call requests are received handles the scheduling of the inmates who made the requests for dental care. Ex. 9 at 29:14-18, 148:20-24.

> **RESPONSE:** Disputed. The policy at Stateville may be that any inmate requiring
>
> dental care may put in a sick call request, and that "whichever dentist is available when the
>
> sick call requests are received handles the scheduling," but this did not consistently happen
>
> in Mr. Brown's case. In Mr. Brown's case, he submitted several written and oral sick call
>
> requests regarding his painful tooth #29 and was ignored. (Dkt. 210-1, at 96:6-120:9).

12.     On May 2, 2017, Plaintiff submitted a sick call request to the dental department, requesting a cleaning. Ex. 7 at p. 3; Ex. 16 at p. 51.

RESPONSE: Disputed. On May 2, 2017, Mr. Brown submitted a sick call request,

but someone filled out the request on Mr. Brown's behalf and put "clean" on the form.

(Dkt. 210-1, 132:21-7, Brown 000185.)

13.     On May 5, 2017, Dr. Orenstein saw Plaintiff at the dental clinic. Ex. 7 at p. 3; Ex. 16 at p. 72. Plaintiff complained of pain in the lower right quadrant of his mouth, so Dr. Orenstein performed a dental exam and took radiographs of Plaintiff's mouth. Ex. 7 at p. 3; Ex. 9 at 31:7-12. Dr. Orenstein determined Plaintiff's tooth no. 29 was malpositioned and impacted. Ex. 7 at p. 3. He recommended extracting the tooth, prescribed Plaintiff ibuprofen for the complained-of pain, and noted in the dental chart that he would be referring Plaintiff to an oral surgeon. *Id.*; Ex. 16 at p. 41; Ex. 9 at 31:7-12.

RESPONSE: Subject to the Introductory Statement above, Undisputed. Mr.

Brown further states that extraction is a form of oral surgery. (Dkt. 210-7, at 31:7-13,

101:22-102:6.)

14.     Dr. Mitchell did not have any supervisory duties or functions with respect to Dr. Orenstein. Ex. 3 at 13:18-21. Drs. Mitchell and Orenstein were equals in terms of the work they performed as clinical dentists at Stateville. Ex. 3 at 13:22-23, 14:2.

RESPONSE: Subject to the Introductory Statement above, Undisputed.

15.     On May 8, 2017, Dr. Craig, who performed on-site surgeries at IDOC facilities, examined Plaintiff. Ex. 7 at p. 4; Ex. 16 at p. 72. He determined Plaintiff's tooth could be extracted at the facility, rather than needing to be extracted by an oral surgeon outside of Stateville. Ex. 7 at p. 4; Ex. 3 at 41:4-7; Ex. 9 at 33:18-22. Dr. Craig also noted that Plaintiff was ***asymptomatic*** at that time. Ex. 7 at p. 4, 10.

RESPONSE: Subject to the Introductory Statement above, sentences one and two

are Undisputed. Mr. Brown disputes the third sentence. Mr. Brown disputes that he was

asymptomatic at the time of this visit. Mr. Brown told Dr. Craig explicitly that he was in

pain. (Dkt. 210-1, at p. 41:22-42:5.)

16.     Plaintiff's asymptomatic tooth did not need to be immediately extracted. Ex. 7 at p. 10; Ex. 9 at 39:11-16. Had the tooth remained asymptomatic, it may never have become

necessary to extract it. Ex. 7 at p. 10. At no point did Plaintiff's malpositioned tooth require emergency extraction. Ex. 10 at 81:12-15, 18-25.

> **RESPONSE:** Disputed in part. The first sentence of Paragraph 16 is Defendant's
>
> characterization, not a statement of facts. Defendant's characterizations are irrelevant and
>
> should be disregarded. Dr. Orenstein did not testify that the tooth did not need to be
>
> immediately extracted. (Dkt. 213-9, at 39:11-16.) Additionally, the characterization of the
>
> tooth as "asymptomatic" is inaccurate. Dr. Craig only stated only that Mr. Brown's tooth
>
> was asymptomatic on May 8, 2017, which, again, Mr. Brown disputes. (Dkt. 210-3, Brown
>
> 000230). Mr. Brown was in continual pain from at least May 5, 2017 to the extraction on
>
> July 18, 2017. (Dkt. 213-6, at p. 7.) Subject to the Introductory Statement above, the rest
>
> of Paragraph 16 is Undisputed.

17.     As a general matter, people can live with asymptomatic malpositioned teeth their entire lives without needing any dental intervention. Ex. 13 at 13:18-22; Ex. 3 at 36:23-25, 37:11-15. Extracting a malpositioned tooth is generally considered an elective procedure. Ex. 13 at 23:12-17.

> **RESPONSE:** Disputed in part. Extracting a malpositioned tooth is necessary
>
> when the patient is in pain. (Dkt. 210-7, at 196:3-20, 205:18-21, 206:5-18.) Subject to the
>
> Introductory Statement above, the rest of Paragraph 17 is Undisputed.

18.     It is unusual for a malpositioned tooth to suddenly start causing excruciating pain on its own. Ex. 9 at 132:22-24.

> **RESPONSE:** Disputed. An impacted tooth can suddenly start causing someone
>
> pain, even after years. (Dkt. 213-12, at 107:17-22.)

19.     Plaintiff had lived with the malpositioned tooth no. 29 for approximately 20 years before he voiced any complaints. Ex. 9 at 131:12-13, 17-18; Ex. 10 at 81:8-11; Ex. 7 at p. 11. Furthermore, prior to the extraction of tooth no. 29, there was no infection or pathology related to this tooth. Ex. 7 at p. 11.[1]

---

[1] Defendant cites to the incorrect page for her assertion, Mr. Brown's answer assumes she meant

**RESPONSE:** Disputed in part. Mr. Brown had lived with the malpositioned tooth for approximately 20 years, but the statement "before he voiced any complaints" is not supported by any documentation cited by Defendant Mitchell. Indeed, it would be impossible for Defendant Mitchell to know that Mr. Brown had never voiced a complaint about his tooth in 20 years. Subject to the Introductory Statement above, the rest of paragraph 19 is Undisputed.

20.     After Dr. Craig examined Plaintiff on May 8th, Dr. Orenstein submitted a referral for what was an elective extraction of tooth no. 29, which was in line with the protocol for specialized care—like oral surgery.  Ex. 7 at p. 4; Ex. 3 at 31:4-18; Ex. 9 at 33:18-22; Ex. 10 at 81:18-25.

**RESPONSE:** Disputed. Paragraph 16 is Defendant's characterization, not a statement of facts. Defendant's characterizations are irrelevant and should be disregarded. Dr. Craig recommended an extraction and at no point used the term "elective." (Dkt. 210-3, at Brown 000230.)  Nothing cited by Defendant Mitchell supports that contention.

21.     Once the referral is approved and the dental department receives the approval, a copy is placed in the mailbox of the doctor who requested the service.  Ex. 3 at 33:2-15.  For on-site surgery approvals like the one in this case, the service is scheduled for Dr. Craig's next available date. Ex. 3 at 45:12-23, 54:18-25; Ex. 9 at 33:6-12.  All approvals for on-site oral surgery went into a folder specifically designated for on-site surgeries, as opposed to surgeries performed by off-site doctors, which are scheduled by an entirely different department.  Ex. 3 at 41:14-25, 42:1.

**RESPONSE:** Disputed. It may be the practice of the dental department to schedule onsite surgery approvals for Dr. Craig's next available date, but that is not what happened in this case. Mr. Brown's onsite extraction was approved on May 15, 2017, but his tooth was not extracted until July 18, 2017, and his extraction was offsite. (Dkt. 213-6, at 7-8.)

22.     Dr. Craig made his own schedule on an ongoing basis and coordinated his visits directly with each facility's dental department.  Ex. 3 at 46:7-20; Ex. 9 at 32:8-11, 15-21, 36:6-12;

---

to cite page 10 of Exhibit 7.

Ex. 10 at 40:24-25, 41:1-5, 9-16, 47:19-25, 48:1-25, 49:1-5. He did not provide Wexford with a master schedule for all facilities ahead of time. *Id.* Dr. Craig usually provided about one week's notice of his next visit to the facility. Ex. 9 at 32:8-11, 15-21.

> **RESPONSE:** Disputed in part. Mr. Craig's schedule for Stateville was drafted and made available to Stateville medical staff at least one week before Dr. Craig's visit. (Dkt. 213-9, at 32:13-33:12.) Subject to the Introductory Statement above, the rest of paragraph 22 is Undisputed.

23. Once informed of his next scheduled visit, the dental department entered it into the appointment book. Ex. 9 at 32:8-11, 15-21. The schedule of patients for Dr. Craig's next visit would be written up by someone at the dental clinic, usually a doctor, the week before he was coming in. Ex. 3 at 45:12-23, 54:18-25; Ex. 9 at 33:6-12; Ex. 10 at 40:24-25, 41:1-5, 9-16, 47:15-18, 48:20-25, 49:1-5. The process included pulling the folder with the approved on-site referrals and scheduling patients based on factors like referral date and whether the patient was symptomatic or not (information that is provided on the approval itself). Ex. 3 at 45:12-23, 54:18-25; Ex. 9 at 33:6-12; Ex. 16 at p. 5.

> **RESPONSE:** Disputed in part. Mr. Brown disputes the last sentence of Paragraph 23. None of the sources cited by Defendant Mitchell support the assertion that scheduling patients was based on whether the patient was symptomatic. That statement is Defendant Mitchell's characterization of the facts. Defendant Mitchell's characterizations are irrelevant and should be disregarded. Subject to the Introductory Statement above, the rest of Paragraph 23 is Undisputed.

24. On June 16, 2017, Plaintiff had a face-to-face meeting with his counselor. Ex. 14 at p. 9. He had no questions and expressed no concerns. *Id.*

> **RESPONSE:** Disputed. Pursuant to Local Rule 56.1(a)(3) Defendants were required to submit a statement of material facts. Paragraph 24 should be disregarded as immaterial.

25. On June 23, 2017, Dr. Sandhu approved Plaintiff for off-site extraction of tooth no. 29 at Joliet Oral Surgeons. Ex. 4 at pp. 2-3; Ex. 16 at p. 5. The approval notes that Plaintiff has been in intermittent pain and on ibuprofen. *Id.*

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

26. Also on June 23, 2017, Plaintiff met with his counselor face-to-face. Ex. 14 at p. 9. He only requested an audit of his trust fund balance. *Id.*

**RESPONSE:** Disputed. Pursuant to Local Rule 56.1(a)(3) Defendants were

required to submit a statement of material facts. Paragraph 24 should be disregarded as

immaterial.

27. On June 28, 2017, Dr. Mitchell saw Plaintiff, who now complained of pain to his lower right jaw. Ex. 4 at p. 14; Ex. 7 at p. 4; Ex. 16 at p. 72. There is no indication that Plaintiff presented with anything other than a complaint of pain—there was no abscess or other urgent medical condition. Ex. 3 at 56:10-11, 15-20; Ex. 4 at p. 14. Dr. Mitchell confirmed that Plaintiff was scheduled to go offsite for oral surgery on a later date and informed him of this. Ex. 3 at 48:20-25; 49:1-8, 50:24-25. She also prescribed ibuprofen for the pain. Ex. 4 at p. 14; Ex. 3 at 48:20-25.

**RESPONSE:** Disputed in part. The first and second sentences of Paragraph 27 is

Defendant Mitchell's characterization, not a statement of fact. Defendant Mitchell's

characterizations are irrelevant and should be disregarded. Subject to the Introductory

Statement above, the rest of Paragraph 27 is Undisputed.

28. For non-narcotic medications, such as ibuprofen and antibiotics, the patient is given the medication immediately after the dental appointment. Ex. 3 at 23:3-7, 24:20-21, 25:16-23, 26:2-20; Ex. 9 at 80:24, 81:1-18. For narcotics, like medications that contain codeine, the medication is provided on a "watch-take" basis, meaning that it is under the supervision of a nurse and the inmate cannot keep the medication in his cell for later use. Ex. 3 at 26:2-20.

**RESPONSE:** Disputed. The policy at Wexford may be that for non-narcotic

medications, such as ibuprofen and antibiotics, the patient is given the medication

immediately after the dental appointment, but this did not happen in Mr. Brown's case.

(Dkt. 210-1, at 85:24-86:8). Mr. Brown was prescribed ibuprofen and Tylenol but did not

receive it. (*Id.*) The policy at Wexford may be that for narcotic medications, like Tylenol

3, the medication is provided on a "watch-take" basis, but this did not happen in Mr.

Brown's case. (*Id.* at 52:1-9; 54:15-18; 68-10-13). Mr. Brown was prescribed Tylenol 3 but never received it. (*Id.*)

29.     Prior to June 28, 2017, Dr. Mitchell had not been involved in Plaintiff's dental care. Ex. 4 at pp. 9-14; Ex. 3 at 56:2-6, 58:25; 59:1-7.

**RESPONSE:** Disputed. Mr. Brown recalls Dr. Mitchell examining his tooth on May 5, 2017. (Dkt. 210-1, at 37:23–24, 38:4–5). In late May or early June, Mr. Brown put in two requests to Dr. Mitchell. (Dkt. 210-1, at 96:6–9, 18, 99:5-7, 15). He asked the nurses to inform Dr. Mitchell that he was in pain. (*Id.* at 102:3-103:5). He also submitted at least three written requests to Dr. Mitchell. (*Id.* at 109:9-14).

30.     On July 4, 2017, Plaintiff refused to attend nurse sick call because he wanted to go to commissary instead. Ex. 16 at p. 13, 52. Plaintiff was not in any acute distress at that time and was informed that he should sign up for nurse sick call if needed. *Id.*

**RESPONSE:** Disputed. Pursuant to Local Rule 56.1(a)(3) Defendants were required to submit a statement of material facts. Paragraph 30 should be disregarded as immaterial. The handwritten notes in Dkt. 213-16, at 13, 52 are unintelligible.

31.     Between May 11, 2017, and July 4, 2017, Plaintiff visited the commissary four times and spent $381.70 on various items, including cookies, pop tarts, chocolate candy bars, popcorn, sodas, and snack cakes. Ex. 14 at pp. 14-16. Pain relieving medicines, such as Tylenol and ibuprofen are available for purchase at the prison commissary, but Plaintiff never purchased any. Ex. 2 at 24:19-24, 55:1-6.

**RESPONSE:** Disputed. Pursuant to Local Rule 56.1(a)(3) Defendants were required to submit a statement of material facts. Paragraph 31 should be disregarded as immaterial. What Mr. Brown purchased at the commissary is not relevant to any claims or defenses in this matter. And whether Mr. Brown purchased pain-relieving medications is immaterial because Mr. Brown was given pain medication throughout May, June, and July of 2017. (*See infra*, Defendant's Statement of Facts, Nos. 49-51.)

9

32.     On July 11, 2017, Dr. Orenstein saw Plaintiff for a routine exam, bitewing radiographs, and an oral cancer screening. Ex. 7 at p. 4; Ex. 16 at p. 72.   In addition, he scheduled an appointment for Plaintiff to get fillings and for tooth no. 29 to be extracted. Ex. 7 at p. 4.

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

33.     On July 13, 2017, Plaintiff again refused nurse sick call, stating, "[n]o, I'm straight." Ex. 16 at p. 14, 53.   Plaintiff was not in any acute distress and did not voice any complaints. *Id.*  He was advised to sign up for sick call if any problems arose. *Id.*

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

34.     On July 18, 2017, Plaintiff went to Joliet Oral Surgeons to have tooth no. 29 surgically extracted. Ex. 7 at p. 4.  The oral surgeon did not recommend a soft food diet for Plaintiff after the extraction, as it was not medically necessary.  Ex. 13 at 30:16-20.

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

35.     At the time of his tooth extraction on July 18th, Plaintiff did not appear to be in any significant pain or distress.  Ex. 13 at 21:9-16, 22:3-5, 23:12-14, 29:20-24, 30:1-5.  There was no abscess at tooth no. 29.  Ex. 13 at 24:3-7, 65:24, 66:1.

**RESPONSE:** Disputed in part. Dr. Schieve cannot recall if he asked Mr. Brown if

he was in pain before the extraction. (Dkt. 213-13, at 21:20-24.) Dr. Schieve testified that

he assumed there was a valid reason that Mr. Brown was at Joliet Oral Surgery. (*Id*.) Dr.

Schieve also testified that the reason Mr. Brown might not have been in pain the day of the

extraction is because he was taking a pain medication. (*Id*. at 22:6-22.) Dr. Schieve was

not asked if Mr. Brown was in significant pain. Dr. Schieve was asked if Mr. Brown was

in excruciating pain. (*Id*. at 29:20-30:2). Dr. Schieve said no because, "excruciating pain

would be if you held your arm out and I cut it off…" (*Id*.) An impacted tooth is lower on

the pain scale. (*Id*.) Dr. Schieve also wrote in his treatment notes before the extraction that

Mr. Brown had been in pain for a year. (Ex. D, at Joliet Oral Surgeons 000002.) Subject to

the Introductory Statement above, the rest of Paragraph 35 is Undisputed.

36.     Without a complicating factor, such as a tooth abscessing, extracting a malpositioned tooth is not an emergency and there is no timeframe during which it must be extracted, if it needs to be extracted at all.  Ex. 13 at 23:18-24, 24:1, 28:18-23.

>       **RESPONSE:** Disputed. There could be harm in leaving a malpositioned tooth in
>
>       somebody's mouth if the tooth is putting pressure on the adjacent teeth roots, which is
>
>       called a "periodontal defect." (Dkt. 213-11, at 92:4-93:5). Additionally, Mr. Brown had a
>
>       complicating factor of diabetes, which can "result in poor, delayed wound healing and
>
>       wound infection." (Dkt. 213-6, at 9; Dkt. 213-11, at 112:18-113:17).

37.     Any pain Plaintiff experienced from tooth no. 29 was most likely due to trapped food debris between the malpositioned tooth and the gum, which could be treated by cleaning out the tooth and maintaining appropriate oral hygiene.  Ex. 13 at 23:2-8, 25:3-8.  Additionally, over-the-counter medication was an appropriate treatment for managing any pain Plaintiff experienced. Ex. 13 at 25:9-13, 65:7-10.

>       **RESPONSE:** Disputed. Mr. Brown disputes the first sentence because there are
>
>       numerous reasons, outside of food debris accumulating, that can cause a malpositioned
>
>       tooth to cause pain. (Dkt. 210-7, at 100:2-16.) The cause of Mr. Brown's pain from the
>
>       impacted and malpositioned tooth is not stated in his medical records. (Dkt. 210-3, at
>
>       Brown 000230.) Mr. Brown disputes the second sentence because a malpositioned,
>
>       impacted tooth may need to be treated with oral surgery (as was required in this case). (Dkt.
>
>       213-11, at 91:18-22; 99:13-100:23). Over-the-counter medication can be an appropriate
>
>       treatment for managing pain from a malpositioned, impacted tooth (*Id.* at 99:9-12; 122:16-
>
>       25), but it was not sufficient to treat Mr. Brown's pain.

38.     On July 19, 2017, Plaintiff was seen by both Drs. Orenstein and Mitchell. Ex. 7 at p. 5; Ex. 3 at 57:5-20.  He was prescribed pain medication by the oral surgeon, Tylenol #3, and an antibiotic by Dr. Mitchell.  *Id.*; Ex. 4 at p. 5.  Additionally, Dr. Mitchell provided Plaintiff with Motrin as a back-up pain medication, because unlike Tylenol #3, which is a watch-take medication, Plaintiff could keep Motrin in his cell and take it if necessary to manage his pain in-between receiving Tylenol #3.  Ex. 3 at 57:5-20.

**RESPONSE:** Disputed. On July 19, 2017, Plaintiff was also seen by Dr. Obaisi. (Dkt. 210-9, Ex. C.) Tylenol #3, Ibuprofen, and Amoxicillin were prescribed per Dr. Obaisi. (Dkt. 210, Ex. C.) Subject to the Introductory Statement above, the rest of Paragraph 38 is Undisputed.

39.     From July 18, 2017, through July 24, 2017, Plaintiff was given Tylenol #3 every day. Ex. 16 at p. 88.

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

40.     On July 24, 2017, Dr. Orenstein saw Plaintiff, who complained of extraction-site pain. Ex. 7 at p. 5; Ex. 4 at p. 13; Ex. 9 at 71:4-10. Dr. Orenstein examined Plaintiff, determined there was a dry socket at the extraction site, and treated Plaintiff for the dry socket. *Id.* The medical record has a note that Plaintiff already had pain medication. Ex. 7 at p. 10; Ex. 9 at 71:4-10.

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

41.     The next day, July 25, 2017, Dr. Orenstein again saw Plaintiff, who was still complaining of pain. Ex. 4 at 13; Ex. 7 at p. 5; Ex. 9 at 73:11-15. Dr. Orenstein irrigated and repacked the dry socket. *Id.*

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

42.     The following day, July 26, 2017, Dr. Orenstein again saw Plaintiff, who complained of a sore throat and difficulty swallowing. Ex. 4 at p. 13; Ex. 7 at p. 5; Ex. 9 at 75:3-9. Dr. Orenstein referred Plaintiff to a Physician Assistant. Ex. 7 at p. 5; Ex. 9 at 75:3-9.

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

43.     Dr. Orenstein next saw Plaintiff on July 28, 2017, and Plaintiff reported he was not in pain. Ex. 4 at p. 13; Ex. 7 at p. 5. Plaintiff also reported that he had seen the Physician Assistant and was prescribed an antibiotic and throat lozenges for the throat issues. Ex. 7 at p. 5; Ex. 9 at 75:20-24.

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

44.     On July 31, 2017, Dr. Orenstein again saw Plaintiff. Ex. 4 at p. 12; Ex. 7 at p. 6. He irrigated, cleaned, and re-packed the dry socket at the extraction site. Ex. 7 at p. 6; Ex. 9 at 76:1-6.

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

45.     In addition to the frequent dental care he received from Dr. Orenstein from July 26, 2017, through July 31, 2017, Plaintiff was also given Tylenol #3 twice per day. Ex. 16 at p. 88.

**RESPONSE:** Disputed. Mr. Brown may have been prescribed Tylenol #3, but he never received it. (Dkt. 210-1, at 85:24-86:8.)

46.     Dr. Mitchell's last day at Stateville was July 31, 2017.  Ex. 8 at ¶ 1.

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

47.     Between May 1 through December 31, 2017, Dr. Mitchell only saw Plaintiff on two occasions, June 28, 2017, and July 19, 2017. Ex. 3 at 58:25, 59:1-7.  By his own admission, Plaintiff only saw and talked to Dr. Mitchell twice during the relevant period.  Ex. 2 at 117:12-16, 125:1-4.

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

48.     The only written requests or notes that Plaintiff submitted to anyone were sick call requests, which were not the sole responsibility of Dr. Mitchell and could have been reviewed and processed by any dentist at Stateville, regardless of what the specific issue listed on the sick call request stated.  Ex. 2 at 104:4-11, 121:15-24, 122:1; Ex. 3 at 17:19-25, 18:1-3, 17-25, 19:1, 3-8.

**RESPONSE:** Disputed in part. Mr. Brown submitted written sick call requests. (Dkt. 210-1, at 96:6-9, 18; 99:5-7, 15; 102:17-103:5, 109:9-14). Mr. Brown reasonably believed his written requests went to Dr. Mitchell, specifically, because he saw someone write "dental" on the request. (*Id.* at 110:15-22). A nurse also specifically told Mr. Brown that she had left a message for Dr. Mitchell. (*Id.* at 119:22-120:9).

49.     Plaintiff saw a nurse every day in May of 2017 for administration of medication that must be done under the supervision of a medical professional.  Ex. 16 at p. 80.

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

50.     Plaintiff saw at least one nurse every day in June of 2017 for the administration of medications that must be done under the supervision of a medical professional.  Ex. 16 at p. 86.

**RESPONSE:** Subject to the Introductory Statement above, Undisputed.

51.     Plaintiff saw at least one nurse every day in July of 2017 for the administration of medications that must be done under the supervision of a medical professional.  Ex. 16 at p. 88, 90.

**RESPONSE:**  Subject to the Introductory Statement above, Undisputed.

Dated:  November 21, 2022

Respectfully Submitted,

Dante Brown

By:___/s/ *Mark J. Silberman*_____
One of his attorneys

Benesch Friedlander Coplan and Aronoff
71 S. Wacker Drive, Suite 1600
Chicago, Illinois 60606
Tel:  (312) 212-4949
Email:  MSilberman@beneschlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2022 I electronically filed the foregoing document with the clerk of the court for the Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

By:____/s/ *Mark J. Silberman*_____