UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANTE BROWN, ) | |
| ) | Case No. 18-cv-05955 |
| Plaintiff, ) | |
| ) | Judge Sharon Johnson Coleman |
| v. ) | |
| ) | |
| WEXFORD HEALTH SOURCES, INC., ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

After facing complications with his dental treatment at Stateville Correctional Center ("Stateville"), plaintiff Dante Brown brought this lawsuit against defendants Wexford Health Sources, Inc. ("Wexford"), the Estate of Dr. Saleh Obaisi, Dr. Richard Orenstein, the Estate of Dr. Frederick Craig (collectively, the "Wexford Defendants"), and Dr. Jacqueline Mitchell. Brown contends defendants demonstrated deliberate indifference to his serious medical needs, violating the Eighth Amendment. He also brings state law claims of medical malpractice against the individual defendants,[1] as well as vicarious liability and institutional negligence claims against Wexford. Before the Court are the Wexford Defendants' and Dr. Mitchell's motions for summary judgment. Because the motions raise similar issues, and Brown responded to both in an omnibus brief, the Court addresses the motions together. For the following reasons, the Court grants in part and denies in part the Wexford Defendants' motion [209] and grants Dr. Mitchell's motion in its entirety [212].

---

[1] Brown's second amended complaint frames this claim as a negligence claim, but it is clear from Brown's briefing that this claim is intended as a medical malpractice claim against the individual defendants.

1

**Background**

The following facts are undisputed, unless otherwise noted.[2] Brown has been housed at Stateville since July 2009. Dr. Mitchell and Dr. Orenstein are licensed dentists. Dr. Mitchell was employed by the Illinois Department of Corrections ("IDOC") and worked at Stateville from 2002 through July 31, 2017. Dr. Orenstein was employed by Wexford, a private corporation contracted by the State of Illinois to provide medical treatment to incarcerated persons, and also worked at Stateville. Dr. Mitchell had no supervisory role over Dr. Orenstein, or vice versa. Wexford also employed Dr. Craig, an oral surgeon, who worked with Wexford from March 1993 through October 11, 2017.[3] Dr. Craig came to IDOC facilities, like Stateville, to perform onsite surgeries. Dr. Obaisi, a medical physician, was Stateville's medical director.

Before May 2017, Brown had a malpositioned tooth for about 20 years. On May 2, 2017, Brown submitted a sick call request to Stateville's dental department.[4] Three days later, Brown saw Dr. Orenstein. Brown reported pain in his lower right section of his mouth, and Dr. Orenstein examined the area and took radiographs of his mouth. Dr. Orenstein concluded that Brown's tooth No. 29 was malpositioned and recommended extraction. In the interim, Dr. Orenstein prescribed Brown ibuprofen and noted he would refer Brown to an oral surgeon. Brown also claims he first saw Dr. Mitchell around this time for his tooth pain but could not recall the specific day. Dr. Mitchell disputes seeing him in May and no medical records suggest this visit occurred.

On May 8, Brown saw Dr. Craig and Dr. Orenstein. Dr. Craig examined the tooth and determined that it could be extracted at Stateville, rather than offsite. Although Dr. Craig noted that

---

[2] Defendants and Brown challenge each other's statements of fact for being unsupported or not complying with the local rules. The Court only considers statements of fact that are undisputed and / or supported by record evidence.

[3] Because Dr. Craig passed away in June 2018, this case proceeds against his estate. For the purposes of this Opinion, the Court refers to Dr. Craig's estate as "Dr. Craig." The Court will similarly address the Estate of Dr. Obaisi as "Dr. Obaisi."

[4] The parties dispute whether this request was for a teeth cleaning.

Brown was asymptomatic, Brown attests that he specifically told Dr. Craig about his pain. Dr. Orenstein submitted a referral for Brown's onsite tooth extraction. Defendants contend that this referral would have been scheduled for Dr. Craig's next available visit to Stateville, and that Dr. Craig ordinarily provided his schedule to Stateville one week in advance. But, for reasons unclear to the Court, Dr. Craig did not perform the surgery, nor was the onsite surgery ever scheduled.

Brown contends that he faced continual pain from May 5 onwards. However, the record shows that Brown waited approximately two weeks to inform nurses about his pain after his original visits with the dental department. When he did complain about his tooth pain to the nurses, Brown testified that he believed that Dr. Mitchell received his complaints. However, there is no evidence that she ever received these notes or his complaints. Brown's onsite surgery referral was approved on May 15. The record is fairly sparse regarding what occurred next. A medical record dated June 15 shows that Dr. Orenstein submitted another referral, this time for an offsite extraction. On June 23, Dr. Sandhu—another Wexford dentist—approved the request, noting Brown's intermittent pain. Dr. Obaisi appears to have signed a document discussing the referral and ultimate surgery on July 24, 2017.[5]

Five days later, on June 28, Brown met with Dr. Mitchell, complaining of tooth pain. She confirmed that Brown was scheduled for offsite oral surgery and prescribed him pain medication. Then, on July 11, Dr. Orenstein again saw Brown for a routine exam and scheduled an extraction and filling for Brown. On July 18, Brown went to Joliet Oral Surgeons, an offsite facility, where his

---

[5] Brown contends that Dr. Obaisi signed this request in June. (Dkt. 231 at 9.) The Wexford Defendants responded that "Wexford admits Dr. Obaisi signed the Medical Special Services Referral and Report on June 24, 2017" but in the same response contradict this statement, maintaining that "Dr. Obaisi signed the document *after* Plaintiff's off-site extraction was completed in July 2017." *Id.* Confused, the Court looked to the original record. The record cited by both parties reads "7/24/17" next to Dr. Obaisi's signature and makes no mention of June 24, 2017. (Dkt. 222-3, IDOC_000165). The Court thus finds contentions that Dr. Obaisi signed this document in June to be unsupported by the record.

3

tooth was extracted. That same day, Dr. Obaisi prescribed Brown Tylenol #3, a pain medication with codeine in it.

Brown contends that he faced severe pain after the surgery. The day after the surgery, Dr. Mitchell and Dr. Orenstein saw Brown and prescribed him pain medication and antibiotics. Dr. Orenstein noted the area was healing. Brown contends he was also seen by Dr. Obaisi, who prescribed various pain medications. For the next week, Brown was provided Tylenol #3 every day. Brown again met with Dr. Orenstein on July 24, and complained of pain at the extraction site and vomiting. Dr. Orenstein determined Brown had dry socket[6] and treated it. The next day, when Brown continued to report his pain, Dr. Orenstein again irrigated and repacked the dry socket. That day, Dr. Obaisi appears to have recommended a follow-up dental appointment. The following day, Brown informed Dr. Orenstein that he had a sore throat and difficulty swallowing, and Dr. Orenstein referred Brown to a Physician Assistant. On July 28, Brown saw Dr. Orenstein for a follow-up but did not report any pain. On July 31, Brown returned to Dr. Orenstein who again irrigated, cleaned, stimulated bleeding, and repacked the dry socket. At this appointment, Dr. Orenstein noted exposed bone at the site.

Brown next saw Dr. Orenstein on August 4. Brown reported to Dr. Orenstein that he had soreness at the site, but no pain. Again, Dr. Orenstein noted the exposed bone, and cleaned and repacked the dry socket. On August 7, Brown saw Dr. Orenstein for a follow-up appointment, where Brown explained the dry socket dressing had come out. Dr. Orenstein repacked the socket, finding that Brown's healing appeared satisfactory. Two days later, Brown reported pain. He saw Dr. Orenstein on August 10, who cleaned the area but noted that the site was not totally healed. He consequently ordered Brown to have a soft diet for two weeks. On August 21, Brown submitted

---

[6] It is the Court's understanding that dry socket sometimes occurs after a tooth is removed and walls of the socket are exposed, which can cause pain at an extraction site. (Dkt. 220 at ¶ 48, Dkt. 231 at ¶ 26.)

another a sick call for pain at the extraction site. He saw Dr. Orenstein the next day, who again noted that the site was taking longer than normal to heal, perhaps due to Brown's diabetes. Dr. Orenstein irrigated the site and prescribed penicillin and ibuprofen.

On September 1, Brown saw another onsite dentist, Dr. Garg. He similarly noticed Brown's slow healing process and that Brown had granulated tissue. His notes reflect that a bone chip was removed from the site. Brown next saw Dr. Orenstein on September 8 for a follow up, who noted his healing was slow but satisfactory. At the end of September, Brown placed another sick call complaining of pain, but it does not appear that he saw anyone in the dental department at this time. Brown placed another sick call, complaining of severe pain, on October 9. The next day, Dr. Orenstein saw Brown and removed a piece of bone, prescribing him ibuprofen for pain.

About a month later, on November 3, Brown saw Dr. Orenstein for a follow-up. At this appointment, Dr. Orenstein noted exposed bone, and placed a referral for another appointment at Joliet Oral Surgeons, which was denied. Dr. Orenstein saw Brown again on November 17, and in early December, he followed up on the referral, which was then approved. On December 14, 2017, Brown went to Joliet Oral Surgeons who removed a piece of bone and prescribed pain medication. Dr. Obaisi signed a request form regarding this procedure on December 14, 2017. (Dkt. 222-3, IDOC_000167.)

**Legal Standard**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal citations omitted). In determining whether a genuine issue of material fact exists, this Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). However, "[m]erely alleging a factual dispute cannot defeat the summary judgment motion." *Samuels v. Wilder*, 871 F.2d 1346, 1349 (7th Cir. 1989). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**Discussion**

Brown brings a § 1983 claim against Dr. Mitchell, Dr. Orenstein, and the estates of Dr. Obaisi and Dr. Craig, claiming they acted with deliberate indifference to his medical needs. Brown also argues that Wexford is liable under *Monell v. Dept. of Social Servs. of New York*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), for having a custom, policy, or practice that violated the Eighth Amendment's protections against cruel and unusual punishment. Lastly, Brown argues that all the individual defendants committed medical malpractice, and that Wexford is vicariously liable for the acts of its agents and was institutionally negligent. Defendants move for summary judgment on all counts, and to dismiss Brown's punitive damages claim. The Court considers the liability of each defendant in turn.

"Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016) (internal citation omitted). To succeed on a deliberate indifference claim, a plaintiff must satisfy both the objective and subjective elements of the claim. *See Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). The objective element is met when the plaintiff shows that he faced a serious medical need. *Id.* Here, this element is uncontested—Brown's dental issues constituted a serious medical need.

Next, the plaintiff must show that the defendant acted with a "sufficiently culpable state of mind." *Id.* (internal citation omitted). The individual must "put forth evidence to establish that the

6

defendant knew of a serious risk to the prisoner's health and consciously disregarded that risk."

*Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). Courts have found that:

> [s]tate-of-mind evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment, the defendant's persistence in a course of treatment known to be ineffective, or proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment.

*Whiting*, 839 F.3d at 663. The plaintiff "does not need to prove that his complaints of severe pain were literally ignored; rather he must only show that the defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (internal citations omitted).

Preliminary Matter

Defendants request that the Court disregard Brown's expert report. Dr. Shulman, Brown's expert, was originally a consultant in *Lippert v. Baldwin*, a putative class action alleging deficient health care provided to individuals at IDOC institutions. *See Lippert v. Baldwin*, No. 10 cv 04603, 2017 WL 1545672, at *1 (N.D. Ill. Apr. 28, 2017) (Alonso, J.). In *Lippert*, the court ordered that the hired "[e]xpert, his consultants and assistants shall not provide opinions and/or testimony in unrelated cases based on knowledge and/or information gained in the course of performing their services in the matter." (Dkt. 210-10 at 1(c).) Defendants argue that Dr. Shulman violated this court order by preparing the expert report in this case. But this Court will not exclude Dr. Shulman's report in its entirety. Dr. Shulman, as a licensed dentist, has the capacity to issue opinions regarding the standard of care of dentists more generally. Thus, the Court takes his opinions under consideration. As for any opinion regarding care at IDOC facilities like Stateville specifically, the Court finds it need not decide the question of admissibility now because the Court rests its decision on other grounds.

Dr. Orenstein

Brown's deliberate indifference claim against Dr. Orenstein hinges on whether Dr. Orenstein's actions delayed Brown's treatment, both in seeking an extraction and during the subsequent healing process. When the court considers a deliberate indifference claim based on delay, "we ask how serious the condition in question was, how easy it would have been to treat it, and whether it exacerbated an injury or unnecessarily prolonged pain." *Thomas v. Martija*, 991 F.3d 763, 769 (7th Cir. 2021). But "[d]elay need not be extreme; failing to provide a very easy treatment or accommodation can suffice, if unnecessary suffering resulted." *Id.*

First, Brown claims Dr. Orenstein knew about the risk to Brown's health (from the delayed extraction) and disregarded this risk. Brown argues that Dr. Orenstein knew about his pain and yet referred Brown for onsite treatment with knowledge that an onsite surgery would not be scheduled for some time. It is unclear whether the dentists were aware of Dr. Craig's next onsite visit, and thus it is disputed whether Dr. Orenstein knew when he made the referral for an onsite surgery that Brown's surgery would not take place imminently.

Brown also contends it was Dr. Orenstein's responsibility to follow up on his surgery and ensure Brown received timely treatment, but that he failed to do so. Dr. Orenstein responds that because Dr. Craig diagnosed Brown's tooth as asymptomatic, surgery was not immediately required and an onsite referral (which could be completed later) was a medically sound recommendation. *See Holloway*, 700 F.3d at 1073 (discussing how deliberate indifference requires a showing that the action was "such a substantial departure from accepted professional standards that it is reasonable to infer that [the doctor] did not base his decision on a medical judgment"). However, Brown testified that he told Dr. Craig explicitly about his pain, such that the tooth could not have been asymptomatic. This creates a dispute of material fact as to whether the tooth was asymptomatic. *See Thomas*, 991

8

F.3d at 769 (discussing how the plaintiff's account of the conversation with the doctor is considered competent evidence).

It is undisputed that Dr. Orenstein knew of Brown's pain from their original appointment. The Court sees nothing in the record to show *when* Brown was supposed to have his surgery, nor any medical reason for the delay, especially if Brown was in pain. It was not until over one month later that Dr. Orenstein made a referral to an offsite surgeon, and then Brown waited another month to have his surgery. The Wexford Defendants maintain that this was a reasonable course of treatment that is entitled to deference. Nonetheless, this Court determines that a reasonable jury could find that Dr. Orenstein acted with deliberate indifference to Brown's pain given this delay in scheduling the extraction. *See, e.g., McGowan v. Hulick*, 612 F.3d 636, 641 (7th Cir. 2010) (discussing how a two-month delay to wait to see an onsite dental surgeon could be considered "too long to wait"); *Smego v. Mitchell*, 723 F.3d 752, 756 (7th Cir. 2013) (finding that the dentist's promise to treat teeth, and then delay in providing such treatment, could constitute deliberate indifference); *Karim v. Obaisi*, No. 14 C 1318, 2017 WL 4074017, at *6 (N.D. Ill. Sept. 14, 2017) (Kendall, J.) (finding that waiting two-months for a follow-up appointment for a tooth abscess could constitute deliberate indifference).

Furthermore, Brown also argues that Dr. Orenstein's actions after the extraction constituted deliberate indifference. His theory rests on two grounds: that Dr. Orenstein persisted in a course of treatment that was known to be ineffective and that he delayed recommending Brown to a specialist to extract the exposed bone. "[F]aced with an inmate experiencing ongoing suffering from a serious medical condition, a prison physician cannot doggedly persist in a course of treatment known to be ineffective without violating the Eighth Amendment." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (internal citation omitted)). Indeed, the record shows that Dr. Orenstein saw Brown repeatedly over the course of the summer and fall, but generally continued with the same treatment

9

(irrigating and repacking the dry socket). A jury could find this course of treatment unreasonable, alongside Dr. Orenstein's decision to wait until November to refer Brown to an offsite specialist. Thus, the Court finds that these issues of fact preclude awarding Dr. Orenstein summary judgment on Brown's § 1983 claim.

As for Brown's medical malpractice claim against Dr. Orenstein, in Illinois, a medical malpractice claim requires that plaintiff prove "(1) the proper standard of care for the defendant physicians; (2) an unskilled or negligent failure to comply with the appropriate standard; and (3) a resulting injury proximately caused by the physicians' failure of skill or care." *Wipf v. Kowalski*, 519 F.3d 380, 384 (7th Cir. 2008) (internal citations omitted). The experts of both parties disagree as to the appropriate standard of care, creating a dispute of fact. In addition, the same fact issues discussed above preclude the Court from granting summary judgment to Dr. Orenstein on this claim. Thus, the Court denies summary judgment as to Dr. Orenstein on Brown's medical malpractice claim.

Dr. Craig

Neither party spends much time arguing whether summary judgment is appropriate as to Dr. Craig. For the same reasons expressed above, the Court denies Dr. Craig's request for summary judgment on both claims. There is a disputed question of fact as to whether Brown's tooth was asymptomatic at the time of the May 8 appointment. The Court finds this could be determinative as to whether recommending an onsite appointment, with no apparent expected date for the surgery, was appropriate. Therefore, the Court denies summary judgment as to Dr. Craig on both the § 1983 and medical malpractice claims.

Dr. Obaisi

The Wexford defendants maintain that Dr. Obaisi cannot be held liable in this case because he had no involvement in providing dental care at Stateville. Yet, Brown has pointed to several

instances in the record, including prescriptions refills and a request for a dental follow-up, that show that Dr. Obaisi had some involvement in Brown's dental care, albeit in a supervisory role. A supervisor can be liable under § 1983 when they "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Matthew v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (internal citation omitted). The extent of Dr. Obaisi's supervisory role of the dental group is disputed. However, the Court finds that the disputed evidence is not material, because Brown has not pointed to Dr. Obaisi's knowledge over the issues with his dental care.

To sustain a deliberate indifference claim, "[i]t is not enough that there was a danger of which a prison official *should have been* aware, rather, the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) (emphasis in original and internal citation omitted). To show Dr. Obaisi's knowledge of the delays in his care, Brown points to documents Dr. Obaisi apparently signed. (Dkt 222-3, IDOC_000165, IDOC_000168.) But neither document was signed *before* the treatments occurred. Thus, the Court does not see evidence upon which a reasonable jury could find that Dr. Obaisi was aware of the supposed delays in his care when they were happening. Furthermore, the care Dr. Obaisi provided near the date of extraction does not suggest deliberate indifference to Brown's medical needs. Because Brown has failed to point to evidence of Dr. Obaisi's knowledge, nor of deficiencies in the limited care he provided, the Court grants summary judgment for Dr. Obaisi on Brown's § 1983 claim. Similarly, because Dr. Obaisi's actions were so limited, the Court does not see evidence where a reasonable jury could find him negligent. The Court grants summary judgment for Dr. Obaisi on the medical malpractice claim, too.

Dr. Mitchell

Dr. Mitchell asserts that Brown failed to demonstrate that she was subjectively aware of a substantial risk to his health, and subsequently disregarded it. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (explaining that the plaintiff must "provide evidence that an official *actually* knew of and disregarded a substantial risk of harm") (emphasis in original). She contends that she had no knowledge of Brown's medical condition until she treated him on June 28, 2017. Brown disputes this, testifying that Dr. Mitchell was the first person he spoke to about his ailments. But Brown could not recall when he spoke to Mitchell. In his response to Dr. Mitchell's statements of fact, he did not dispute the statement: "Between May 1 through December 31, 2017, Dr. Mitchell only saw Plaintiff on two occasions, June 28, 2017, and July 19, 2017." (Dkt. 221 at ¶ 47.) Based upon a review of the record, the Court does not see any evidence that Dr. Mitchell saw Brown before June 28.

Brown also argues that Dr. Mitchell was aware—and disregarded—his continued complaints of pain that were reported to her through his sick calls to prison nurses. There is no evidence of a sick call slip sent to Dr. Mitchell beyond Brown's testimony. Assuming Brown's testimony is true, and that he did tell multiple nurses about his pain, there is no evidence that this information reached *Dr. Mitchell* specifically, beyond his own belief that she was the recipient of the information. A belief is insufficient to sustain a claim at summary judgment. *See Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022) (discussing how "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion") (internal citation omitted). The Court finds Brown has failed to show that Dr. Mitchell was aware of his continued pain before June 28, 2017.[7]

---

[7] Mitchell also contends that it is illogical to believe that Brown was in excruciating pain during this time-period, focusing on his commissary requests for food, instead of medicine, and the lack of sick call requests. The Court finds that Brown's testimony on this topic, discussing his level of pain, creates a dispute of fact on this topic. Thus, Brown's supposed level of pain will not be further addressed in this Opinion.

12

Furthermore, Brown claims that Dr. Mitchell acted with deliberately indifference because, as a supervisor, she did not keep track of Dr. Craig's schedule and when Brown would receive the extraction surgery. But there is no evidence that Dr. Mitchell was a supervisor for either Dr. Craig or Dr. Orenstein. Indeed, she testified that she is responsible for schedules, but the Court has seen no evidence that Dr. Mitchell was specifically responsible for Brown's appointment or was aware that a surgery was even scheduled before she met with Brown in late June. An individual can only be liable under § 1983 if there is evidence of direct and personal involvement in the action leading to liability. *See Kuhn v. Goodlow*, 678 F.3d 552, 557 (7th Cir. 2012). Given the lack of evidence that Dr. Mitchell had knowledge of Brown's condition before June 28, 2017, the Court finds that a reasonable jury would not find that Dr. Mitchell had direct and personal involvement in his care before she saw him in late June.

Even then, the record does not suggest that Dr. Mitchell's medical care when she saw Brown amounted to deliberate indifference. It is undisputed that Brown saw Dr. Mitchell on June 28 and July 19, 2017. During the June visit, Dr. Mitchell informed Brown of the upcoming offsite extraction and provided him pain medication in the interim. On July 19, 2017, she provided pain medication after the surgery. Brown has pointed to no deficiencies in this care, and the Court does not see one. Therefore, the Court grants summary judgment for Dr. Mitchell on Brown's deliberate indifference claim.

As for Brown's negligence claim, summary judgment for Dr. Mitchell is also appropriate. Dr. Mitchell focuses on the third element of medical malpractice, arguing that Dr. Shulman presented entirely conclusory opinions that show no evidence of proximate cause between Dr. Mitchell's conduct and Brown's injury. *See Morisch v. United States*, 653 F.3d 522, 531 (7th Cir. 2011) ("Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent,

13

speculative, or merely possible."). Brown argues that his expert explains that Dr. Mitchell could have contacted Wexford to ask when Dr. Craig would be available for surgery. But this opinion does not show, to a reasonable degree of medical certainty, that Dr. Mitchell caused Brown harm. Thus, the Court grants Dr. Mitchell summary judgment on all counts against her.

Wexford

The Court next considers Brown's *Monell* claim against Wexford. There are three ways to hold an entity responsible under *Monell*: if there is "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Fields v. City of Chi.*, 981 F.3d 534, 562 (7th Cir. 2020) (internal citation omitted). Brown focuses on the second theory, that Wexford has engaged in a custom of delaying or avoiding dental treatments. Brown points to two instances of delayed referrals, for the original extraction and the extraction of exposed bone. The Court finds that this is insufficient evidence to support an inference of widespread conduct. *See, e.g., Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010) (discussing how "even three" instances is likely insufficient to suggest a widespread practice). Therefore, the Court grants summary judgment to Wexford on Brown's *Monell* claim.

Nevertheless, the vicarious liability claim goes forward. The Wexford defendants did not argue that Wexford was not vicariously liable for the medical malpractice claims against its dentists. Because the claims against Dr. Craig and Dr. Orenstein are not dismissed, this claim against Wexford stands as well. *See Groeller v. Evergreen Healthcare Ctr. LLC*, 31 N. E. 3d. 869, 875, 391 Ill. Dec. 894, 900 (1st Dist. 2015) (discussing how Illinois law provides for vicarious liability for hospitals for employee conduct).

Lastly, Brown contends that, given the repeated delays in treatment, Wexford was institutionally negligent in how it operated its referral process. "Illinois law recognizes an

administrative and managerial duty on the part of the hospital to review and supervise the treatment of its patients." *Williams v. Erickson*, 962 F. Supp. 2d 1038, 1044 (N.D. Ill. 2013) (Kennelly, J.). Here, Brown has pointed to a series of delays at Stateville which, although insufficient for a deliberate indifference claim, could suggest a negligent referral process. This count also remains.

Punitive Damages

Lastly, the Court considers whether to strike Brown's request for punitive damages. The Wexford Defendants maintain that punitive damages against Dr. Craig should be dismissed because punitive damages lose their deterrent value when levied against the deceased. The majority of courts in our district considering this issue have dismissed punitive damages claims against the Estate of Dr. Obaisi for this reason. *See Crawford v. Aguinaldo*, No. 18-cv-4882, 2022 WL 4601135, at *11–12 (N.D. Ill. Sept. 30, 2022) (Rowland, J.). Because the same logic applies to the estate of Dr. Craig, the Court dismisses the punitive damages claim as to Dr. Craig. Regarding Dr. Orenstein, punitive damages are recoverable in § 1983 actions "[w]hen the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous disregard to the federally protected rights of others." *Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019) (internal citations omitted). Given that punitive damages are recoverable under § 1983 against a living person, the Court finds that deciding this issue now would be premature and does not dismiss the punitive damages claim against Dr. Orenstein.

**Conclusion**

For the above reasons, the Court grants Dr. Mitchell summary judgment on all counts and grants summary judgment for Dr. Obaisi on all counts and for Wexford on the § 1983 *Monnell* claim. The claims against Dr. Orenstein and Dr. Craig stand, as well as the vicarious liability and institutional negligence counts against Wexford. The Court sets a status in 30 days to discuss the parties' next steps.

IT IS SO ORDERED.

Date: 7/17/2023

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge